FILED

09/19/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 21, 2019 Session

## STATE OF TENNESSEE v. CHRISTOPHER CALDWELL

**Appeal from the Criminal Court for Sumner County**
**No. CR973-2015     Dee David Gay, Judge**

_____

### No. M2018-02068-CCA-R3-CD

_____

The Defendant, Christopher Caldwell, appeals the Sumner County Criminal Court's order revoking his community corrections sentence for his convictions for burglary of a motor vehicle and felony theft and ordering him to serve the remainder of his effective twelve-year sentence in confinement. The Defendant contends that the trial court abused its discretion by revoking his community corrections sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and JOHN EVERETT WILLIAMS, P.J., joined.

Jon David Rogers (on appeal), Hendersonville, Tennessee, and David Von Wiegandt (at revocation hearing), Nashville, Tennessee, for the appellant, Christopher Caldwell.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Ray Whitley, District Attorney General; and Lytle Anthony James, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On October 20, 2016, the Defendant pleaded guilty to burglary of a motor vehicle and felony theft and received consecutive sentences of six years each, for an effective twelve-year sentence. The trial court ordered the Defendant to serve his sentence on community corrections. On July 31, 2017, a community corrections violation warrant was issued, alleging that the Defendant tested positive for cocaine and benzodiazepine on July 5, 2017. At the October 2, 2017 revocation hearing, the Defendant conceded he had violated the conditions of his release. The court revoked the Defendant's community

corrections sentence but returned him to community corrections, which was to be supervised in another county.

On February 9, 2018, a community corrections violation warrant was issued, alleging that the the Defendant failed to report to his community corrections officer on January 29, 2018, that he admitted using heroin on January 8, 2018, and that he violated his curfew. On July 30, 2018, a subsequent community corrections violation warrant was issued, alleging that he had been convicted of three counts of "Possession or Casual Exchange" on May 2, 2018.

At the October 29, 2018 revocation hearing, community corrections officer Brandi Jimerson testified that the Defendant admitted to her that he used heroin on January 8, that he failed to report to her on January 29, and that he failed to comply with his curfew. She said that she sought a second violation warrant after she learned the Defendant had been convicted of three counts of possession of a controlled substance on May 2. Certified copies of the judgments of conviction were received as an exhibit.

On cross-exmaination, Ms. Jimerson testified that the Defendant was participating in a "dual disorder program," which she described as a treatment team composed of a psychiatrist and a program specialist to ensure that a defendant received any necessary mental health and substance abuse treatment. She identified a judgment of conviction, which reflected that on April 21, 2016, the Defendant pleaded guilty to the sale of a controlled substance and received a ten-year sentence to be served on community corrections. Ms. Jimerson agreed the drug-related judgment reflected that, in April 2018, the Defendant was ordered to serve one year in confinement for violating the conditions of his release and was returned to community corrections. She said that the grounds for the April 2018 revocation in the drug-related case were the same grounds for seeking revocation in the present case.

Ms. Jimerson testified that she had reviewed the Defendant's medical records, which were received as an exhibit. She knew the Defendant had received mental health treatment at multiple facilities and had been diagnosed with opioid use disorder, a mood disorder, schizophrenia, amphetamine-type substance use disorder, and suicidal ideations. She recalled the medical records showed the Defendant had attempted suicide previously. She said that she met with the Defendant before he was initially placed on community corrections, that he appeared to be "very psychotic," that he would not make eye contact with her, and that he was mumbling, skinny, and disheveled. She recalled having difficulty understanding him. She agreed that some defendants with substance abuse problems reported using drugs "to try and drown out the noise."

Ms. Jimerson testified that the Defendant was always pleasant and respectful. She said that he had a girlfriend, who appeared to cause "issues" for him, but that he decided not to comply with the conditions of his release. She said that, at some point, the Defendant lived at a group home, that he took his medication as directed during this time, and that he remained in compliance when he took his medication. She said, though, that the Defendant absconded from the group home without his medication. She said the Defendant reported in January 2018 that the manager of the group home had asked the Defendant to obtain heroin for the manager, that the Defendant did not report this information until he admitted using drugs again, and that the manager was fired immediately.

Upon examination by the trial court, Ms. Jimerson testified that the Defendant was a career offender but that she did not did not know the number of his previous convictions. She said that she had been aware of the Defendant's mental health issues since he was initially placed on community corrections and that his mental health records began as a juvenile. Ms. Jimerson agreed with the court that although "we" had attempted to work with the Defendant by placing him in the dual disorder program, he had not complied with the conditions of his release. She said that the Defendant had been in the dual disorder program since February 2017 and noted that the previous revocation occurred in October 2017.

Ms. Jimerson testified that after the Defendant admitted relapsing, he received and successfully completed an in-patient alcohol and substance abuse treatment program. She said that the Defendant obtained part-time employment, bought a truck, and was permitted to come and go from the group home but that he began using heroin again, which resulted in her placing restrictions on his movements. She recalled that the Defendant was only permitted to drive to the community corrections office and to his doctor's office and that he stopped reporting to her office and began violating his curfew.

On recross-examination, Ms. Jimerson testified that the Defendant had not been in the dual disorder program or on probation in any previous case.

The Defendant testified that relative to his drug-related convictions in the unrelated case, he had completed the "Go Further Program" and that he would complete the residential drug abuse program in a few months. He identified for the trial court various certificates he received while participating in these programs and said he had learned that he had many resources to help maintain his sobriety and that he could live his life without using drugs and alcohol. He said that he had been in the residential drug treatment program for approximately five months and that the in-patient treatment program in which he previously participated lasted twenty-eight days.

The Defendant testified that he began using heroin and cocaine at age twelve or thirteen, just before his mother died. He said he began using drugs because of the voices he heard telling him that he would never amount to anything. He said the drugs made the voices disappear temporarily. He said that after the twenty-eight-day in-patient treatment program, he remained drug-free for two to three months and that he took his medication during this time, even though he continued hearing voices. He recalled that his medication had been changed multiple times and said that he developed tolerances to his medications, requiring changes.

The Defendant testified that he failed to report to his community corrections officer and that he had no justification for it. He said that, at this time, the staff at the group home treated him "wrong," that he was "on edge," that his supervising officer took away all of his privileges, and that he did not think his supervising officer was acting in his best interest. He described being on edge when his medication did not stop the voices and his thoughts and mind raced. He said that he began using drugs again because he "just wanted to feel good for a minute" and to "feel regular."

The Defendant testified that the group home environment contained temptations to use drugs because most of the managing staff used drugs and drank alcohol. He said that the staff wanted him to obtain drugs for them. He admitted obtaining drugs for staff members and said he made a poor decision because he wanted to feel accepted by the people who managed the group home. He thought his time at the group home would be "smoother" if he fit in with the staff. He denied having friends. He said that when he attended school, he had to "prove" himself to other children. He recalled fighting and being expelled from school and said his mother educated him at home. He recalled that although he had contact with his father, his father suffered from mental illness, diabetes, and heart problems and could not care for him. He said that after his mother died, his father became incarcerated. The Petitioner said that he lived with "people in Arkansas" for a while, that he lived with an uncle in Memphis, and that he ended up living on his own by age sixteen. He said he obtained his GED.

The Defendant testified that the "dark angel" referenced in the mental health records was the dark angel of his mother, who always had something negative to say and instructed him to harm himself and others. He said that when he took his medication and it was the proper regimen, the voices became "level." He said that he could stay sober and "had the right intentions." He said that he intended to obtain a sponsor, planned to attend "meetings," and would comply with the conditions of his release. He understood his addiction was a disease and said he had tools to help maintain his sobriety. He said that in his effort to remain sober, he would talk to his sponsor, use the church for support, perform volunteer work for the church, and attempt to find housing within the church in order for him to "occupy [his] mind with something positive."

Upon questioning by the trial court, the Defendant testified that he had been previously convicted of two drug-related offenses and forgery. He denied he had a lengthy criminal history that would qualify him as a career offender and said he only recalled having three previous felony convictions, not six. He recalled being convicted of selling crack cocaine, possibly in 2017. He said he had been convicted of two motor vehicle thefts.

The Defendant could not recall when his mental health treatment began but recalled that on one occasion he awoke in an Arkansas hospital after being treated and receiving medication. He said that he took the medication until it did not work any longer and that he most likely returned to using drugs. He said that he told his doctor several times that his medications no longer worked properly, that the doctor changed the medications, and that, ultimately, he began to self-medicate with drugs to alleviate the voices. He said that he was at fault for using drugs rather than working with his doctor to address his mental illness. He agreed that the court could not make him take his medication but said that he still had hope and that he was not beyond help.

The trial court revoked the Defendant's community corrections sentence and ordered him to serve the remainder of his sentence in confinement. The court found that the Defendant, a career offender, wanted "to shortcut" his medication, although he had been in the dual disorder program offered by community corrections. The court found that the Defendant thought it was "easier to get high." The court stated that although relapses occurred, "there [was] a difference between accountability[,] accepting responsibility and wanting to change." The court found that the Defendant would not cooperate until he "change[d] his heart." The court found that the Defendant needed to accept responsibility for his conduct. This appeal followed.

The Defendant contends that the trial court abused its discretion by revoking his community corrections sentence and ordering him to serve the remainder of the sentence in confinement. He argues that the court should have placed significant weight on his severe mental illness. The State responds that the evidence supports the court's revoking the Defendant's community corrections sentence and ordering him to serve his sentence. We agree with the State.

A trial court may revoke a defendant's probation upon its finding by a preponderance of the evidence that the defendant violated a condition of the sentence. T.C.A. § 40-35-311(e) (2014) (prescribing the procedure for probation revocation proceedings). Given the similar nature of a sentence of community corrections and a sentence of probation, the same principles are applicable in deciding whether the revocation of a community corrections sentence is proper. *State v. Harkins*, 811 S.W.2d 79, 83 (Tenn. 1991). Our supreme court has concluded that a trial court's decision to

revoke a defendant's community corrections sentence "will not be disturbed on appeal unless . . . there has been an abuse of discretion." *Id*. at 82 (citing *State v. Williamson*, 619 S.W.2d 145, 146 (Tenn. Crim. App. 1981)). An abuse of discretion has been established when the "record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980); *see State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

When a trial court finds by a preponderance of the evidence that a defendant has violated the conditions of probation, the court "shall have the right . . . to revoke the probation." T.C.A. § 40-35-311(e)(1) (2014). "In probation revocation hearings, the credibility of witnesses is for the determination of the trial judge." *Carver v. State*, 570 S.W.2d 872, 875 (Tenn. Crim. App. 1978) (citing *Bledsoe v. State*, 387 S.W.2d 811, 814 (Tenn. 1965)). When a defendant's community corrections sentence is revoked, the court "may resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed." T.C.A. § 40-36-106(e)(4) (2014).

The record reflects that the Defendant admitted using heroin and failing to report to his community corrections officer. Likewise, the Defendant was convicted of three counts of possession of a controlled substance. This evidence supports the trial court's finding that the Defendant violated the conditions of his community corrections supervision. The record reflects that the court considered the Defendant's mental health in making its determinations. The court did not abuse its discretion in revoking the Defendant's community corrections sentence and ordering him to serve the remainder of his sentence in confinement. *See* T.C.A. §§ 40-35-308(a), (c); -310; -311(e)(1). The Defendant is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE